IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOHNATHAN ALLEN JERRELL, JR.                                                   PLAINTIFF

v.                            Civil No. 5:21-cv-05080

PATROL DEPUTY AARON SMITH,
Madison County Sheriff's Office;
CORPORAL JONATHAN DAVID CORNELISON,
Madison County Sheriff's Office; and
SERGEANT MICHAEL JAMES SLOAN,
Madison County Sheriff's Office                                                DEFENDANTS

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff, Johnathan A. Jerrell, Jr. ("Jerrell"), currently an inmate of the Randall L. Williams Correctional Facility of the Arkansas Division of Correction, filed this civil rights action under 42 U.S.C. § 1983. Jerrell proceeds *pro se* and *in forma pauperis* ("IFP"). Jerrell's claims center on a high-speed chase, a crash during the chase, and the subsequent use of physical force against him on September 18, 2020. Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable P. K. Holmes, III, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

The case is before the Court on the Motion for Partial Summary Judgment (ECF Nos. 26-28) filed by Defendants on the official capacity claims asserted against them. Defendants concede genuine issues of material fact preclude the entry of judgment in their favor on the individual capacity claims. Jerrell has responded to the Motion. (ECF Nos. 30-32).

**I.      BACKGROUND**

At approximately 3:30 to 3:45 a.m., on September 18, 2020, Jerrell, who was wanted on

1

multiple felonies, was observed at a convenience store by officers of the Fayetteville Police Department ("FPD"). (ECF No. 28-5 at 3). Jerrell was in a stolen vehicle, a 2017 Chevrolet Silverado, which had a firearm in it when stolen. *Id.* at 4. When Jerrell saw the FPD officers approaching his vehicle on foot, he fled the parking lot in the Silverado travelling out of the Fayetteville city limits, though Goshen, and into Madison County. *Id.* Jerrell was being pursued by Officer Vongphachunh of the FPD. *Id.* Officer Vongphachunh indicates he observed Jerrell run multiple red lights and stop signs and driving in the opposite lane of traffic nearly causing a head on collision. (ECF No. 28-2 at 3). Officer Vongphachunh quit pursuing the vehicle when it reached Madison County. *Id.*

At his deposition, Jerrell testified it is his habit to always "run" from the police "[b]ecause I don't like going to jail." (ECF No. 28-5 at 8). While he always fled, Jerrell stated he "never resisted arrest." *Id.* In other words, "[w]hen I am caught, I'm caught . . . . I've never been in a physical altercation with them. If they've got their hands on me, I'm done." *Id.; see also* (ECF No. 28-5 at 10).

The Madison County Sheriff's Office ("MCSO") was advised of the pursuit. (ECF No. 28-7 at 19). Sergeant Sloan was the first officer to pick up the pursuit. (ECF No. 28-5 at 7). Jerrell turned onto Highway 295 and was able to lose Sergeant Sloan on a dirt road. *Id.* at 5. When Jerrell emerged back on the highway, Corporal Cornelison chased him to Highway 412. *Id.* Jerrell was heading eastbound in the westbound lane—in the wrong lane of traffic. *Id.* Jerrell observed the flashing blue lights of a vehicle being driven by Deputy Smith. *Id.* Smith pulled off to the side of the road and as Jerrell was "going past him at a high rate of speed, [Deputy

Smith] pulled out and hit my truck" on the front right quarter panel of the passenger side.[1] *Id.* Jerrell estimates he was going approximately seventy miles per hour when Deputy Smith's vehicle struck him. *Id.* at 6. Corporal Cornelison was pursuing Jerrell in the eastbound lane. *Id.* at 5.

The collision knocked a wheel off the Silverado and the airbags deployed. (ECF No. 28-5 at 6). Deputy Smith and Corporal Cornelison approached the vehicle while verbally commanding Jerrell to put his hands out the window. *Id.* At this point, Jerrell did not have any injuries. *Id.* Jerrell took off his seat-belt and put his hands out the window *Id.* The loaded pistol was on the floorboard. *Id.* The officers grabbed Jerrell by the wrist, "drug" him out the window, and then slammed the right side of his face into the pavement. *Id.* at 7. Corporal Cornelison had his knee on the back of Jerrell's neck and Deputy Smith "drug" his right arm and then his left over and handcuffed him. *Id.* Sergeant Sloan arrived when Jerrell was pulled out of the vehicle and "slammed on the ground." *Id.*

Corporal Cornelison began making derogatory comments towards Jerrell. (ECF No. 28-5 at 7). According to Jerrell, Deputy Smith "just started beating on me" in the left eye and temple area. *Id.* Jerrell believes Deputy Smith struck him approximately eight times with a closed fist before Jerrell lost consciousness. *Id.* at 7, 10. At the same time, Corporal Cornelison was striking Jerrell on the head, upper body, and torso area even though he was handcuffed. *Id.* Specifically, Jerrell testified he was "hit in my chest, my ribs, the back of my head, my face, [and] my left eye." *Id.* at 8. Sergeant Sloan did the "[s]ame thing Cornelison did." *Id.* at 10.

After being transported to Madison County's temporary holding facility, Jerrell was examined by Madison County EMS at approximately 5:00 a.m. (ECF No. 28-6 at 1; ECF No. 28-

---

[1] Defendants tell a different version of the accident contending Jerrell drove head-on into the police vehicle. (ECF No. 28-7 at 17-23).

3

10 at 2-3). EMS noted Jerrell had a non-bleeding injury to his left eye and also complained of left shoulder pain. (ECF No. 28-10 at 2). EMS noted a suspected injury due to "tenderness upon palpation in collar bone area and left shoulder blade area." *Id.* Jerrell was transported to Northwest Medical Center. *Id.* He arrived at the hospital at 5:51 a.m. and was diagnosed with a closed fracture of facial bone (left orbital socket), a concussion, and a facial laceration. (ECF No. 28-11 at 2). Jerrell was discharged at 8:36 a.m. *Id.* Jerrell testified the beating went on for well over two minutes. (ECF No. 28-5 at 10, 12) (lasted two minutes and fifty seconds). Until January of 2021, Jerrell had trouble feeling his face from the bottom of his left eye socket to his upper lip. *Id.* at 8. Although he has not been diagnosed with it, Jerrell asserts he has suffered from anxiety and PTSD since this incident. *Id.* at 11.

After his release from the hospital, Jerrell was booked into the Washington County Detention Center ("WCDC"). (ECF No. 28-2 at 1). Jerrell was charged with two counts of theft by receiving, fleeing, aggravated assault, second degree battery, and possession of a firearm by certain persons. *Id.* at 5-6. The incident report indicates Jerrell was also charged with a number of misdemeanors including running at stop sign, speeding, failure to signal, and reckless driving. (ECF No. 28-7 at 17).

When asked about his official capacity claims, Jerrell testified that in his opinion Deputy Smith used deadly force against him when he struck Jerrell's vehicle. (ECF No. 28-5 at 9). Jerrell believes the Defendants violated "all their policies involving emergency driving and pursuit driving." *Id.* at 9, 11-12; *see also* ECF No. 28-8 at 1-3 (policy on pursuit driving). Jerrell indicates the chase should have been terminated when he was proceeding the wrong way on Highway 412, and at any time they lost sight of him for more than 15 to 20 seconds since they

knew where he lived.  (ECF No. 28-5 at 12).   He also believes Defendants failed to follow the use of force policy.  *Id.* at 11.  Jerrell concedes Defendants were allowed to use force against him when he was endangering the public and the officers by traveling in the westbound lane of traffic. *Id.* at 12.  However, he believes the force should have terminated when he was handcuffed.  *Id.*

In his response, Jerrell clarifies that he believes that while Defendants did not follow the pursuit policy, their conduct indicates it was "an accepted unofficial custom" to pursue vehicles in the manner used in this case.  (ECF No. 30 at 1).  Similarly, he believes there was an accepted unofficial custom of using excessive force.  *Id.* at 2.  He points out that two commanding officers from the MCSO were involved in both the pursuit and the use of excessive force, thus condoning the actions of Deputy Smith.  *Id.*  Jerrell maintains this shows the unofficial customs were "not only being followed but encouraged, condoned, participated in and covered up by the upper management of the Sheriff's Office."  (ECF No. 31 at 1).

## II.     APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Com. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical

5

doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat. Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

As noted above, Defendants have moved for summary judgment on the official capacity claims against them. They maintain there is simply no basis for official capacity liability because Jerrell is merely maintaining that Defendants violated the policies of the Madison County Sheriff's Office. To the extent Jerrell seeks to establish custom liability, Defendants argue that the single incident on September 18, 2020, is insufficient evidence of the existence of a widespread unconstitutional practice.

An official capacity claim is considered a claim against the employing governmental entity, here, Madison County. *Crawford v. Van Buren Cnty.*, 678 F.3d 666, 669 (8th Cir. 2012). A governmental entity may not be held liable for an injury inflicted solely by its employees or agents on a *respondeat superior* theory of liability. *Monell v. New York Dep t. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, "[s]ection 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Indep.,*

*Mo.*, 829 F.3d 695, 699 (8th Cir. 2016) (cleaned up).

The first method to establishing municipal liability is to point to a policy that was the moving force behind the alleged constitutional violations. In this context, policy means an "official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Corwin*, 829 F.3d at 700. The MCSO has policies regarding pursuits as well as the use of force. Jerrell does not contend these policies were unconstitutional. In fact, as Defendants correctly point out, Jerrell maintains the policies of the MCSO were not followed by the Defendants. This is the opposite of establishing the existence of an unconstitutional policy. *See e.g., Johnson v. Blaukat*, 453 F.3d 1108, 1114 (8th Cir. 2006) (finding no § 1983 liability where county's policies, which were facially constitutional, were not followed by its employees).

Instead, Jerrell seeks to establish Madison County's liability by showing the existence of unofficial customs which caused the violation of his constitutional rights. Specifically, Jerrell contends the Defendants have: (1) an unofficial custom of engaging in high-speed pursuits in violation of the pursuit policy, and (2) an unofficial custom of using force - including deadly force - in violation of the use of force policy.

"[A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional

7

violation. *Corwin*, 829 F.3d at 700 (cleaned up).

Jerrell relies solely on the September 18, 2020, incident. He points to no other "unconstitutional acts to support an inference of deliberate indifference." *Mick v. Raines*, 883 F.3d 1075, 1079 (8th Cir. 2018). Plaintiffs bear a "heavy burden" in establishing "municipal liability through an unofficial custom." *Id.* at 1079-1080 ("affidavits of three detainees describing alleged constitutional violations are not sufficient to establish a genuine issue of material fact regarding whether there was a widespread custom or practice of unconstitutional misconduct, know to and unaddressed by policymaking officials"). "Evidence that a police department has failed to investigate previous incidents similar to the incident in question may support a finding that a municipal custom exists, and that such a custom encourages or allows officers to use excessive force without concern of punishment." *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999) (citations omitted). It requires evidence of a sufficient number of prior complaints to "to demonstrate that municipalities and their officials ignored police misconduct." *Id.*; *see also, e.g., Parish v. Luckie*, 963 F.2d 201, 204-05 (8th Cir. 1992) (plaintiff presented detailed and compelling evidence that the police department avoided, ignored, and covered up complaints of physical and sexual misconduct by officers); *Harris v. City of Pagedale*, 821 F.2d 499, 501-06 (8th Cir. 1987) (detailed evidence regarding the police officer's previous misconduct and the city's failure to investigate or punish that conduct). A single incident does not suffice. Further, Jerrell does not allege a failure to train or supervise claim. Therefore, Defendants are entitled to summary judgment on the official capacity claims.

## IV. CONCLUSION

For the reasons stated above, it is recommended that the Defendants' Motion for Partial Summary Judgment (ECF No. 26) be **GRANTED** and all official capacity claims be dismissed.

8

This leaves for later resolution the individual capacity claims against the Defendants. Defendants concede there are genuine issues of material fact as to those claims.

**The parties have fourteen (14) days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 28th day of March 2022.

/s/ *Mark E. Ford*
HON. MARK E. FORD
UNITED STATES MAGISTRATE JUDGE